AO 106 (Rev. 5/85) Affidavit for Search Warrant

# United States District Court RECEIVED

## MIDDLE  DISTRICT OF  ALABAMA

2019 JUL 26  A  9 56

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

GULF STATES DISTRIBUTORS LOCATED AT 6000 EAST
SHIRLEY LANE, MONTGOMERY AL 36117

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: 2:19 mj 250 - SRW

I, _____ Michael L. Rodgers _____ being duly sworn depose and say:

I am a(n)  Task Force Officer with the  Drug Enforcement Administration _____ and have reason to believe
                                    Official Title

that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

GULF STATES DISTRIBUTORS LOCATED AT 6000 EAST SHIRLEY LANE, MONTGOMERY AL 36117

in the _____ MIDDLE _____ District of _____ Alabama _____

there is now concealed a certain person or property, namely (describe the person or property)
See Attachment A

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

(1) evidence of a crime; (2) contraband, fruits of crime, other items illegally possessed; or (3) property
designed for use, intended for use, or used in committing a crime;

in violation of Title _____ 21 _____ United States Code, Section(s) _____ 841(a)(1) and (2) _____
The facts to support the issuance of a Search Warrant are as follows:

See attached affidavit incorporated herein by reference and made part of this application.

Continued on the attached sheet and made a part hereof.           ☒ Yes    ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

7/24/2019
Date

at

Montgomery, Al
City and State

HON. SUSAN R. WALKER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT **RECEIVED**
FOR THE MIDDLE DISTRICT OF ALABAMA

2019 JUL 26  A 9:56

IN THE MATTER OF THE SEARCH OF
PREMISES LOCATED AT GULF STATES
DISTRIBUTORS, 6000 E SHIRLEY LANE,
MONTGOMERY, ALABAMA 36117,
INCLUDING ALL BUILDINGS,
STRUCTURES, STORAGE FACILITIES,
AND OTHER ARTIFICIES LOCATED AT
THAT ADDRESS

**DEBRA P. HACKETT, CLK**
**U.S. DISTRICT COURT**
**MIDDLE DISTRICT ALA**
Case No. 2:19mj

UNDER SEAL

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## SEARCH AND SEIZURE WARRANT

I, Michael L. Rodgers, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for the issuance of a warrant to

search the premises of Gulf States Distributors, located at 6000 E Shirley Lane, Montgomery,

Alabama 36117, in order to seize fruits, instrumentalities, and evidence related to possible

violations of: (1) Title 21, United States Code, Section 841(a)(1); (2) Title 18, United States

Code, Section 1347; (3) Title 18, United States Code, Section 924(c); and (4) Title 18, United

States Code, Section 157.  There is probable cause to believe that fruits, instrumentalities, and

evidence of these crimes (further described in Attachment B) will be found in a search of the

premises.

2.      I am an investigator or law enforcement officer of the United States within the

meaning of Title 18, United States Code, Section 2510, that is, an officer of the United States

who is empowered by law to conduct investigations and to make arrests for offenses enumerated

in Title 18, United States Code, Section 2516.  I am employed as a detective for the Opelika,

Alabama police department. I am deputized as a Task Force Officer (TFO) for the Drug Enforcement Administration (DEA).

3. Pursuant to my employment with the DEA, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952 and 1956. I am familiar with, and have employed, all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.

4. In connection with drug trafficking investigations, I have participated in and/or executed numerous search warrants, including residences of drug traffickers/manufacturers and their co-conspirators/associates, and stash houses used as storage and distribution points for controlled substances.

5. The facts in this affidavit come from my personal observations, training, and experience, as well as information obtained from other agents and witnesses. Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact obtained during the investigation. This affidavit is only intended to show merely that there is sufficient probable cause for the requested warrant and does not show all of the facts, circumstances, and knowledge of the matters at hand.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the federal offenses outlined and described below in this affidavit have been committed by Dr. James Henry Edwards. There is probable cause to believe that evidence of such offenses, as described in Attachment B, will be found at the premises described in Attachment A.

2

## JURISDICTION

7.      This Court has jurisdiction to issue the requested because the property to be searched is located within the district.  See Fed. R. Crim. P. 41(b)(1).

## RELEVANT PROVISIONS

8.      Based on my training and experience, and the training and experience of other DEA diversion investigators, special agents, and other law enforcement officers, I know that:

a.      Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance except as authorized by that subchapter.

b.      Pursuant to Title 21, United States Code, Section 822(a)(1) and (a)(2), and 21 C.F.R. § 1301.11 and other regulations, a person who distributes or dispenses any controlled substance, or who proposes to dispense any controlled substance, must obtain a registration from the DEA every three years.

c.      Under 21 C.F.R. § 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which she is licensed to practice her profession and registered with the DEA (unless otherwise exempt from registration).

d.      Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. § 1306.4(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice.  If a physician—even a holder of a DEA registration—issues a prescription and that prescription does not satisfy the above-recited criteria, then the prescription constitutes an unlawful distribution and dispensing of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

3

   e. Title 18, United States Code, Section 1347 makes it a crime to defraud a health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, the money or property owned by, or under the custody or control of, any health care benefit program.

   f. Title 18, United States Code, Section 924(c) makes it a crime to use a firearm in furtherance of a drug trafficking crime.

   g. Title 18, United States Code, Section 157 makes it a crime to make a false or fraudulent representation in relation to a proceeding under title 11 bankruptcy.

   h. The Alabama Board of Medical Examiners (ABME) requires that a physician maintain a patient's complete treatment records (including evaluations, diagnoses, and prognoses) for a period of no less than ten years from the patient's last visit.

## PROBABLE CAUSE

**A.** **Background Information**

  9. The DEA and other law enforcement agencies are investigating James Henry Edwards. Edwards is a physician licensed to practice medicine in Alabama and Connecticut. Edwards currently operates two psychiatric clinics in Alabama. One of those clinics is located at 2127 Executive Park Drive, Opelika, Alabama 36801. The other is located at 229 East 20th Avenue, Suite 10, Gulf Shores, Alabama 36542.

  10. I also know that Edwards operates these two clinics as part of a business incorporated through the office of the Alabama Secretary of State on or about October 11, 2011. That business, Analytic Options, P.C. (Analytic Options) is a domestic professional corporation formed to conduct "all lawful business." According to records of the Alabama Secretary of State, Edwards is the incorporator and the only director of Analytic Options.

4

11.     Additionally, I know that, pursuant to licenses he has with the DEA and the

Alabama Board of Medical Examiners (ABME), Edwards is authorized to prescribe Schedule II,

III, IV, and V controlled substances.  He must do so for legitimate medical purposes and within

the normal course of his psychiatric practice.

**B.     Edwards's Background**

12.     I have reviewed records from the ABME and other governmental regulatory

agencies.  Based on my review of this information, law enforcement agents have a general

understanding of the history of where Edwards has practiced.

**1.     Montgomery, Alabama Analytic Options Practice**

13.     On or about November 28, 2010, Edwards submitted his first application for an

Alabama medical license.  At that time, Edwards resided in Roxbury, Connecticut.  The ABME

issued that license to Edwards on or about January 1, 2011.  The first practice location Edwards

registered with the ABME was 1040 Longfield Court, Montgomery, Alabama 36117.

14.     In late 2011, Edwards renewed his Alabama medical license.  When he did so, he

reported that his practice location had changed to 7956 Vaughn Road, Suite 301, Montgomery,

Alabama 36117.  Around that same time, Edwards filed documents with the Alabama Secretary

of State to create a business entity—Analytic Options, P.C. (Analytic Options).  On the

incorporation documents, Edwards listed Analytic Options's address as 7956 Vaughn Road,

Suite 301, Montgomery, Alabama 36116.  Edwards listed himself as the sole incorporator of

Advance Options.  It is my understanding that Edwards operated his Montgomery practice under

the Analytic Options business.  Agents know that at some unknown time before 2017, Edwards

stopped practicing in Montgomery.

**2.     Opelika, Alabama Grandview Behavioral Health Center Practice**

5

15.     Starting in 2011, Edwards began to practice in both Montgomery and Lee Counties. Agents know from records that, in or around 2011, Edwards worked as an independent contractor at Grandview Behavioral Health Center, located at 2123 Executive Park Drive, Opelika, Alabama 36801. Grandview Behavioral Health Center was a mental health practice group located in Opelika and affiliated with Mountain View Hospital of Gadsden, Alabama. At this facility, Edwards provided psychiatric evaluations and medication management.

16.     When Edwards submitted his 2015 license renewal form to the ABME, he listed Grandview Behavioral Health Center as his primary practice location. Edwards stopped practicing at Grandview Behavioral Health Center in or around 2018.

### 3.     Fairhope, Alabama East Bay Psychiatry Practice

17.     At some point, Edwards began to practice on a part-time basis at East Bay Psychiatry, located at 761 B Middle Street, Fairhope, Alabama 36532. Edwards remained at East Bay Psychiatry from an unknown time and continuing until in or about February of 2017.

### 4.     Opelika, Alabama Analytic Options Practice

18.     At some point, Edwards moved his Analytic Options practice from Montgomery to Opelika. By at least 2017, Edwards practiced on Thursdays and Fridays at the Opelika location described above—2127 Executive Park Drive. Edwards continues to practice in this location.

### 5.     Gulf Shores, Alabama Analytic Options Practice

19.     In or around February of 2017, Edwards stopped practicing at East Bay Psychiatry and opened in Gulf Shores a branch of Analytic Options. He did so at the location described above—229 East 20th Avenue.

6

20.     Edwards continues to practice at this location.  Agents working with me know this because, on or about October 27, 2017, the ABME received a letter signed by Edwards and dated October 16, 2017.  In that letter, Edwards wrote, "I began seeing patients for Analytical Options Inc [sic] at 229 20th Street Suite 10 Uptown Plaza Gulf Shores, AL 36542 approximately the end of January to beginning of February 2017."

## C.     2016 Complaint

21.     Based on my review of DEA records, DEA received a complaint about Edwards on or about April 20, 2016.  On that date, a physician contacted the DEA and reported that he (the physician) works with Edwards and that Edwards was prescribing large amounts of benzodiazepines.  The physician speculated that Edwards may have himself been taking drugs. Due to the age of the tip, I have no further information about the tip.

## D.     Pharmacy Complaints

22.     During the first half of 2019, investigators working with me contacted various pharmacists and employees of pharmacies located in and around Opelika and those in and around Gulf Shores.  Those individuals reported concerns regarding the prescriptions Edwards had issued that customers had brought to their pharmacies for filling.

23.     I know from my training and experience that pharmacy employees have a duty to report to refrain from filling prescriptions known by the pharmacy employees to be illegitimate. I also know that pharmacy employees receive training on identifying illegitimate prescriptions. Things that pharmacy employees look for include: (1) whether the pharmacy is filling a large number of prescriptions for controlled substances from the same physician; (2) whether the pharmacy employee notes that the same physician is repeatedly prescribing the same

combinations of controlled substances; and (3) whether the pharmacy employee observes that the physician is prescribing hazardous combinations of controlled substances.

24.     For this reason, I consider pharmacy employees to be reliable sources of information in investigations of prescribers of controlled substances.

**1.     Opelika Pharmacists**

25.     The following summarizes the information the investigators working with me received from the various Opelika pharmacists:

a.     Sarah Britton of the Kroger pharmacy (2460 Enterprise Drive, Opelika, Alabama) reported that Edwards was prescribing a lot of "Benzos" and that she had seen Edwards prescribe as many as three different benzodiazepines to the same patient at the same time. Britton also reported that Edwards prescribed high quantities of attention deficit-hyperactivity disorder (ADHD) medications, such as dextroamphetamine-amphetamine (commonly known by its brand name version, "Adderall") and lisdexamfetamine (commonly known by its brand name version, "Vyvanse"). According to Britton, in 2018, she telephoned Edwards and questioned him regarding his prescribing practices. Edwards instructed her that his patients needed the medications he prescribed.

b.     Margaret Thompson of CVS pharmacy (1997 Pepperell Parkway, Opelika, Alabama) stated that Edwards seemed to be prescribing the same medications—Adderall, Vyvanse, alprazolam (commonly known by its brand name version, "Xanax"), and clonazepam (commonly known by its brand name version, "Klonopin"). She noted that Edwards often prescribes multiple benzodiazepines on the same prescription. On one occasion, Edwards called the pharmacy to authorize an early refill of a prescription. Based on concerns regarding

8

Edwards's prescribing, the CVS pharmacy no longer accepts new Edwards patients and does not authorize early refills on Edwards prescriptions.

      c.     Glenn Williams of East Alabama Medical Center Apothecary (2200 East Pepperell Parkway, Opelika, Alabama) stated that Edwards prescribed large quantities of controlled substances.

      d.     Eddie Parker of Walgreen's pharmacy (2015 Pepperell Parkway, Opelika, Alabama) stated that Edwards prescribed large quantities of Adderall. Occasionally, Parker called Edwards and questioned his prescribing. Edwards always had reasons for his prescriptions, according to Parker.

      e.     Sherry Holley of Wal-Mart pharmacy (2900 Pepperell Parkway, Opelika, Alabama) reported that Wal-Mart has a corporate policy of not filling prescriptions for Edwards based on concerns regarding his prescribing practices.

      f.     Sabrina Wilder of CVS pharmacy (1498 Opelika Road, Auburn, Alabama) reported that Edwards prescribes "multiple benzos to the same patients." Wilder said that she had called Edwards's office many times to question prescriptions. When she did so, she was told not to "question the doctor." Wilder also said that she knew of at least one patient of Edwards who was in drug rehabilitation. Additionally, according to Wilder, one of Edwards's patients told her that Edwards instructed him to pay cash for his prescription so as to get around a law regulating prescriptions. Wilder could not remember this patient's name.

      g.     Dianna McNay of Kroger pharmacy (300 North Dean Road, Auburn, Alabama) said that Edwards prescribes "benzos for most of his patients."

h.      Katelyn Williams of Walgreens pharmacy (765 East Glenn Avenue,

Auburn, Alabama) reported that they frequently had to call Edwards's office because

information was omitted from prescriptions.  On one occasion, Edwards's speech was slurred.

i.      Brittany Boos of CVS pharmacy (770 East Glenn Avenue, Auburn,

Alabama) noted that it was a running joke in the office that college students went to get

prescriptions from Edwards.  She said that Edwards gave patients multiple benzodiazepines at

the same time.

j.      Jeff Jerkins of Bubba's Medicine Shop (512 2nd Avenue, Opelika,

Alabama) said that Edwards would prescribe "a lot of Benzos to the same patients." He added

that all of Edwards's patients would be on the same prescriptions.

## 2.      Gulf Shores Pharmacists

26.     The following summarizes the information the investigators working with me

received from the various Gulf Shores pharmacists:

a.      A pharmacist at the Walgreen's pharmacy (1421 Gulf Shores Parkway,

Gulf Shores, Alabama) reported that Edwards was prescribing multiple "Benzos" on the same

prescriptions to patients.

b.      Blake Shoemaker of Wal-Mart pharmacy (170 East Fort Morgan Road,

Gulf Shores, Alabama) stated that Edwards was prescribing multiple "Benzos" on the same

prescriptions.  He noted that Wal-Mart's corporate policy was not to fill Edwards's prescriptions.

c.      Evan Tomlinson of Publix pharmacy (160 Cotton Creek Drive, Suite 100,

Gulf Shores, Alabama) said that Edwards was seeing a high volume of patients and prescribing

large amounts of medications.  Tomlinson said that he had previously worked at a Publix

10

pharmacy in Auburn and had seen the same sorts of problems with Edwards's prescriptions there.

d.      Linda Caylor of CVS pharmacy (3820 Gulf Shores Parkway, Gulf Shores, Alabama) reported that she found mistakes on many prescriptions Edwards wrote. She also stated that she saw Edwards prescribing excessive amounts of medication.

## E.      Informant Interviews and Investigation

27.      Next, another law enforcement agency working with the DEA received information from two former patients of Edwards. Those patients were Amber Williams and Eli Bedsole. The following summarizes the information provided by Williams and Bedsole, as well as follow-up investigation regarding that information.

### 1.      Amber Williams

28.      On May 16, 2019, two investigators working with me telephonically interviewed Williams. Williams told those investigators that she saw Edwards after her boyfriend, Bedsole, recommended Edwards to her.

29.      According to Williams, she saw Edwards only one time. The visit, occurring December 13, 2018, was brief—she was with Edwards for only 15 minutes. During those 15 minutes, Edwards asked Williams about her family history. Williams told Edwards that she was adopted. She also told Edwards that she had previously been addicted to Ecstasy and Adderall. Williams explained to Edwards that she was seeing him due to anxiety and panic attacks. She said that, when confronted with these symptoms before, she had taken Klonopin. However, Klonopin had not helped her. At the conclusion of the session, Edwards prescribed Williams 60 2-milligram Xanax tablets and instructed her to take one pill twice per day.

11

30.     Thereafter, Williams filled her prescription. She then proceeded to take 50 pills in three days. This overdosing resulted in Williams being hospitalized for almost a week. Williams spent three of those days in the intensive care unit. When she was released from the hospital, Williams telephoned Edwards and told him about the overdose. Edwards asked Williams for her discharge papers, but Williams refused to provide him with those. Williams concluded the call by telling Edwards that she would not be seeing him again and did not want to continue on the medication.

31.     Soon after she got off of the telephone with Edwards, Williams received a text message from the Publix pharmacy. The message said that her prescription for diazepam (commonly known by its brand name version, "Valium") was ready. Confused, Williams called the pharmacy to ask about the text message. The pharmacist told Williams that Edwards had called in the prescription for her. Williams did not fill the prescription. She confirmed to an investigator working with me that she never discussed with Edwards diazepam or obtaining another prescription.

32.     Following up on this information, an investigator working with me then contacted the Publix pharmacy at issue. The pharmacist provided the investigator with copies of two prescriptions. The first was the December 13, 2018, the prescription Edwards issued to Williams for 60 2-milligram Xanax tablets. The second was a copy of a telephoned prescription for one 5-milligram diazepam pill. The copy appeared to reflect that Edwards had called the prescription into the pharmacy on December 22, 2018.

### 2.     Eli Bedsole

33.     On May 15, 2019, investigators working with me interviewed Bedsole. Bedsole stated that he started seeing Edwards around the middle of 2018. He did so because he was

12

experiencing anxiety and panic attacks.  The first time he went to Edwards, Edwards asked,

"Would you like Xanax?"  Bedsole declined, explaining to Edwards that he had previously taken

Xanax and had "issues" with the drug.  Instead, as best as Bedsole could recall, Edwards

prescribed him two non-controlled medications during that first visit.  Bedsole said that he took

those drugs for some time and then concluded that they were not helping him.

34.     After some time, Bedsole returned to Edwards's office and requested Xanax.

Edwards gave him a prescription for 1-milligram dosages of the drug.  Eventually, Bedsole asked

that Edwards increase the dosage to 2 milligrams.  Edwards did so without asking Bedsole for

any reason for the increase in dosage.

35.     According to Bedsole, he saw Edwards approximately 10 times.  During each of

his first two visits, Bedsole spent around 45 minutes with Edwards.  After that, the visits

typically lasted between five and ten minutes.

36.     Bedsole said that he frequently saw patients in Edwards's office asking for

prescriptions.  He remembered one female patient who was visibly shaking as she asked

Edwards for a new Adderall prescription.

**F.     ABME Subpoena Response**

37.     Additionally, investigators working with me served a grand jury subpoena on the

ABME.  The subpoena requested all records in the ABME's possession related to Edwards.  The

records received in response to the subpoena showed that, in 2017, the ABME began an

investigation of Edwards.  The materials generated during that investigation included the

following:

13

### 1. Medical Records

38.     As part of its investigation, the ABME subpoenaed from Edwards 12 patient files. In October of 2017, Edwards responded to the subpoena by providing the requested records. The records submitted included, for each patient: (1) progress notes prepared by Edwards regarding visits with the patient; (2) superbills prepared by Edwards or a member of his staff containing billing and diagnostic information about the visits; (3) treatment plans prepared by Edwards or members of his staff; and (4) copies of prescriptions signed by Edwards.

### 2. Expert Report

39.     After interviewing Edwards, the ABME sent the medical records and other materials to an independent expert reviewer, Dr. Tarak Vasavada. Dr. Vasavada was, at that time, a Professor and Regional Chair of Psychiatry at the University of Alabama-Birmingham (UAB) School of Medicine's Huntsville campus. He has since retired and now works at Huntsville Hospital.

40.     On April 26, 2018, Dr. Vasavada sent to the ABME his expert evaluation of the Edwards files. In 11 of the 12 files, Dr. Vasavada found excessive dosages of stimulant medications. In all 12 files, Dr. Vasavada identified inadequate documentation and incomplete records. Dr. Vasavada also pointed out that nowhere in the 12 files was there any indication that Edwards conducted a urine drug screen to ensure that patients were not diverting the prescribed medication or taking non-prescribed drugs. Ten of the 12 files reflected duplicate prescribing, that is, prescribing two medications from the same class of drugs to treat the same problem. Additionally, Dr. Vasavada noted that: (1) 8 of the 12 patients received hazardously high dosages of medications; (2) in 2 files, it was apparent that the patients were obtaining pain medications from other providers, however, in neither case did Edwards attempt to obtain records from those

14

other providers; and (3) in 3 files, Edwards gave patients refills even though the patients did not

see him for more than 3 months.

41. Dr. Vasavada also included the following general statement:

[T]here are a number of concerns which, if found individually, would be worrisome, but which seen as a pattern are disturbing. These include the fact that nearly all [of] these patients are young, Patients are living a far distance from him but follow him. He is likely living in the Mobile area but went to Opelika to see patients and some of them have followed him back. Some patients are not asking for high doses and Dr. Edwards has increased the doses of stimulants or is prescribing sedatives with it. Notes do not reflect that Dr. Edwards is willing to negotiate with his patients if they can do equally well on a low dose. He does not justify the need for the high dose. Some notes may be missing from the charts. Taken together, such a pattern of facts is highly concerning for inappropriate prescribing and use of controlled substances.

42. Dr. Vasavada also included specific comments about each file. The significant

points in those evaluations are as follows:

a. Vickie A. – seen by Edwards at the Opelika Grandview Behavioral Health

Center clinic and prescribed dextroamphetamine and alprazolam by Edwards – Edwards's notes

are "barely minimal" with no justification for increasing Adderall dosage. Adderall dosage

seems excessive for patient's weight. No specific symptoms of any of the diagnoses. No

substance abuse evaluation or drug screen.

b. Max C. – seen by Edwards at the Opelika Grandview Behavioral Health

Center clinic and prescribed by Edwards dextroamphetamine – Adderall dose is nearly twice

recommended, and patient was not seen for nearly a year, yet still managed to obtain medications

at the high dosage. Adderall is increased, even though patient is doing well, and there is no

justification for increase. Notes are of low detail. Another person writes the last few notes,

although the note bears Edwards's signature. No EKGs, labs, or drug screens performed even

though patient is on high dose.

15

c. Robert C. – seen by Edwards at the Grandview Behavioral Health Center clinic and prescribed by Edwards methylphenidate, lisdexamfetamine, and dexmethylphenidate – Patient has no current diagnosis of ADHD, but has three stimulants prescribed. No labs, EKG, or drug screens. Two other psychologists wanted to wean the patient off meds, then restart to see if needs had changed, but Edwards did not feel the need to do that.

d. Ashley C. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards diazepam, clonazepam, and hydrocodone – Poor documentation. Two antianxiety medications without justification. No drug screen. Two benzodiazepines prescribed at the same time and no mention of that risk. Soma and Tylenol #3 from another provider, which Edwards has not reconciled. Additionally, Edwards prescribed this patient hydrocodone—a Schedule II opioid pain medicine. It is unclear from the chart why a psychiatrist would do so.

e. Nicole F. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards dextroamphetamine, lisdexamfetamine, and alprazolam – Poor documentation. Notes say nothing about why there are two ADHD meds and two anxiety meds. Edwards went up to 2 milligrams of Xanax without tapering. No drug screen. Edwards prescribed buprenorphine—an opioid often prescribed for pain or to treat opioid dependency. However, there was no mention of the buprenorphine prescriptions in the chart.

f. Dara G. – seen by Edwards at the Fairhope East Bay Psychiatry practice and the Gulf Shores Analytic Options practice and prescribed by Edwards dextroamphetamine – High medication dose, no drug screen or EKG. Poor documentation including why dosages were increased.

16

g.      Matthew H. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine, clonazepam, lorazepam, and alprazolam – Stimulant dose is much higher than it should be, no documentation about why Adderall was added. When patient claimed to have his meds stolen, there was no drug screen. No reasoning as to why two benzos were prescribed and why the dosage is so high.

h.      Adam P. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine, alprazolam, zolpidem, diazepam, and hydrocodone – No explanation given for prescribing 140 mg. per day of stimulants. No explanation is given for increasing dosages of stimulants or benzodiazepines. Failure to conduct EKGs, which would have been appropriate given the high dosage of stimulants prescribed.

i.      Jared S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dextroamphetamine – Poor documentation regarding reasoning for higher than FDA recommended dose. No drug screen, no labs, no EKG.

j.      Melissa S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dexmethylphenidate and diazepam – No ADHD assessment, poor documentation. Higher than daily recommended dose of Foucalin. No drug screen.

k.      Robert S. – seen by Edwards at the Opelika Analytic Options practice and prescribed by Edwards dexmethylphenidate and methylphenidate – No justification for medications. Patient was not seen from 2014-2016, yet still maintained medications. No labs.

**3.      Settlement Agreement**

43.      After receiving the expert's report, on May 16, 2018, the ABME issued to Edwards an order to show cause. The order alleged that Edwards excessively prescribed

17

controlled substances and required that Edwards show cause as to why his license should not be revoked.

44.     Thereafter, in January of 2019, Edwards and the ABME entered into a joint stipulation. The settlement agreement permitted Edwards to persist in his denial of the excessive prescribing allegations. However, Edwards agreed to do the following: (1) use stimulants to treat only ADHD, and not other conditions; (2) limit the daily dosages of all controlled substances; (3) refer to another psychiatrist any patient whose dosage Edwards cannot successfully reduce; (4) utilize urine drug screens; (5) refrain from prescribing controlled substances for weight loss, narcolepsy, sleep apnea, or fatigue; and (6) attend a course on medical recordkeeping and prescribing controlled substances.

### 4.     New Complaint

45.     Approximately three months after the ABME and Edwards entered into the settlement agreement, the ABME received a new complaint about Edwards. This complaint came from Auburn resident Dawn Pierce. Pierce alleged that her son, Taylor Pierce, 29, had been a patient of Edwards's before taking his life on November 11, 2018. According to Dawn Pierce, she believed that Taylor Pierce "was addicted and abused Xanax, all legally obtained by prescriptions from Dr. Edwards."

46.     Dawn Pierce stated that, the week before Taylor Pierce passed away, Dawn Pierce contacted Edwards's office regarding Taylor Pierce's "erratic behavior." Dawn Pierce had previously written letters to Edwards stating that she suspected that Taylor Pierce was abusing drugs. The Friday before his death, Taylor Pierce saw Edwards. He obtained a prescription for Xanax. Two days later, Taylor Pierce committed suicide.

18

47.     According to the complaint, other psychiatrists who treated Taylor Pierce questioned the high dosages of Xanax Edwards prescribed. However, Taylor Pierce—addicted to the medication—kept returning to Edwards. Dawn Pierce considered Edwards's prescribing practices a contributing factor in Taylor Pierce's death.

## G.     Online Comments

48.     During the investigation, agents working with me have accessed online comments posted on physician-review websites, namely vitals.com, healthgrades.com, and google.com. In doing so, investigators found comments about Edwards posted by individuals who purported to have been Edwards's patients. I should note that these comments are anonymous and I have no way of verifying whether or not the commenters were in fact Edwards's patients. Nevertheless, some of the comments found were as follows:

a.     Posted on healthgrades.com on June 16, 2019: "I'd been seeing him for several years, and in that time he would increase my medication without me asking or expressing concern over my dosage. After a year he had me taking a very high daily dose of a controlled substance. He never showed much interest in talking to me, rather he would just start writing my prescription and send me on my way. In April 2019 I went in for my regular appointment and he told me he could no longer see me. He recommended I have my primary care doctor continue to prescribe the medication at the same high dose. No primary care doctor in their right mind would continue Dr. Edwards' regimen! I received a letter a few days later saying my situation was "too complex" for him to continue to see me as a patient. Not only did he leave me high and dry with a drug dependence that he initiated, but he also implied that it was my fault he was firing me as a patient. I see here that his license to prescribe controlled drugs has been suspended. Good riddance!"

19

b. Posted on healthgrades.com on February 25, 2019: "Beware of overmedication."

c. Posted on healthgrades.com on April 12, 2019: "His caseload -- about 20-30 patients per day -- leaves him without any deep understanding of any single patient. Grandview is a pill mill although he recently left and went out on his own so maybe he will lessen his caseload. He seems distracted and not caring. What is the point of telling your life to someone who is distracted? He divides his time between Gulf Shores (yaay, rich people) and Opelika, now. I give two stars because he has, in fairness, prescribed some helpful meds."

d. Posted on healthgrades.com on March 30, 2017: "He didn't even read my case sheet before he sat me down in his office so he was unprepared. He basically said I should lose some weight and get a dog and that was all I needed to get over my depression... I could have saved my time and gas if he was just going to make me feel more depressed .... If my therapist Mrs Barbara wasn't nice and knowledgeable I would never set foot inside grandview ever again!"

e. Posted on vitals.com on June 13, 2019: "Overmedicated me. I almost died."

f. Posted on vitals.com on June 1, 2019: "Going to be detoxed in rehab because of his critical mistake of giving me massive dosages of ATIVAN for 5 years. GOD HELP ME."[1]

g. Posted on vitals.com on January 4, 2019: "Staff mean and he just runs a pill mill...Don't recommend him at all!!"

---

[1] Ativan is a brand-name version of lorazepam. Lorazepam is a Schedule IV benzodiazepine commonly used to treat seizure disorders. It can also be used to treat anxiety.

20

        h.      Posted on vitals.com November 7, 2017: "My daughter came home with 5 meds and not at beginning dosages.... My pharmacy thankfully advised me. Told me to speak with Dana, She is no longer there... Of course. HELP."

        i.      Posted on google.com in June of 2019: "He doesn't care about his patients at all his only concern is that the DEA doesn't shut down his practice. I don't know what he has been doing to draw the attention but obviously he has been doing something unethical, to which his solution has been to cut patients off their medicine and say good luck. Some of these medicines can have drastic effects if abruptly stopped such as suicide and seizures. Just got with my lawyer am filing a Malpractice suit. If anyone else has been a victim of Dr. Edwards you could consider."

## H.    Meeting with Medical Expert

    49.    On June 18, 2019, agents working with me met with Dr. Vasavada—the expert physician retained by the ABME to review Edwards's patient files. During that meeting, Dr. Vasavada stated that, based on his review of the files, Edwards issued prescriptions for controlled substances outside the normal course of professional medical practice and for no legitimate medical purpose. Specifically, Dr. Vasavada found that the following prescriptions given to the following patients on or about the following dates were illegitimate.

| PATIENT | DATES OF TREATMENT | CONTROLLED SUBSTANCES PRESCRIBED ILLEGITIMATELY |
|---------|--------------------|--------------------------------------------------|
| Matthew H. | October 23, 2013 through September 7, 2017 | Dextroamphetamine, clonazepam, lorazepam, and alprazolam. |

| Robert C. | October 20, 2016 through September 12, 2017 | Methylphenidate, lisdexamfetamine, and dexmethylphenidate. |
| Adam P. | April 22, 2013 through July 21, 2017 | Dextroamphetamine, alprazolam, zolpidem, diazepam, and hydrocodone. |

I know from Edwards's records that Edwards saw each of these patients and distributed prescriptions to each patient at his Opelika clinic, within the Middle District of Alabama.

## I. Prescription Health Care Fraud Evidence

50.     I know from records provided by the ABME that patients Matthew H., Robert C., and Adam P. each used commercial insurance to fill some or all of the prescriptions issued by Edwards and deemed by the medical expert to have been illegitimate. Additionally, between January 1, 2014 and June of 2019, Medicaid has paid $253,729 to pharmacies for prescriptions Edwards wrote. During that same period, Medicare has paid $2,416,106 to pharmacies for prescriptions Edwards wrote.

51.     Health insurance providers do not reimburse for illegitimate prescriptions. Therefore, when a prescriber issues a prescription, the prescriber certifies to the patient's health insurance provider that the prescription is for a legitimate medical purpose and within the scope of normal medical practice. Absent such an implicit certification from a prescriber, a health insurance provider will not pay a pharmacy for the costs associated with a beneficiary's prescription.

52.     If Edwards issued illegitimate prescriptions to the three patients listed in paragraph 51, Edwards falsely certified to those patients' health insurance providers that the prescriptions were legitimate. When the patients took those prescriptions to pharmacies to be

22

filled, Edwards caused the patients' health insurance providers to pay for prescriptions that the health insurance providers would not have paid for had they known that the prescriptions were not for legitimate medical purposes and issued within the normal course of medical practice.

53. Such conduct can constitute health care fraud, in violation of Title 18, United States Code, Section 1347. To prove such a charge, it will be necessary to obtain medical records and other records associated with the patients' care to determine whether the prescriptions were or were not legitimate.

## J. Office Visit Health Care Fraud Evidence

54. Between January 1, 2014 and June of 2019, Medicaid has paid $172,293 to Edwards or a clinic with which he is affiliated for services Edwards provided. Similarly, during that time period, Medicare has paid $420,153 to Edwards or a clinic with which he is affiliated for services Edwards provided.

55. I know that some of this money likely constitutes the proceeds of fraud. This is so because Medicare and Medicaid do not reimburse for unnecessary medical office visits. If the sole purpose of a medical office visit was to issue an illegitimate prescription, then a health insurance provider like Medicare or Medicaid will not reimburse for that office visit.

56. If Edwards submitted a claim for an office visit, and the sole purpose of that office visit was to issue an illegitimate prescription, then the submission of the claim constituted health care fraud, in violation of Title 18, United States Code, Section 1347.

57. Based on the above data and the evidence that Edwards issued illegitimate prescriptions, there is probable cause to conclude that Edwards may have issued fraudulent claims for office visits. Additional evidence of such health care fraud will take the form of

23

medical records, copies of prescriptions, superbills, and copies of other health care billing records.

## K. Execution of Search and Arrest Warrants

58. On July 11, 2019, DEA special agents and other law enforcement agents executed: (1) a warrant issued by a United States Magistrate Judge of the United States District Court for the Middle District of Alabama to search Edwards's Opelika office; (2) a warrant issued by a United States Magistrate Judge of the United States District Court for the Middle District of Alabama to search a 2019 Porsche Panamera Edwards had driven to the Opelika office; and (3) a warrant issued by a United States Magistrate Judge of the United States District Court for the Southern District of Alabama to search Edwards's Gulf Shores office.[2] During the searches, the agents found, among other things, the following:

### 1. Opelika Office Search

59. During the search of the Opelika office, the agents found and seized:

a. Numerous medical records;

b. In what appeared to be the right pocket of Edwards's suit jacket (which was draped on a chair in his office), a copy of a prescription for a stimulant controlled substance Edwards had signed and given to his office manager, Daphne King;

c. In what appeared to be Edwards's desk, copy of a handwritten letter from Dawn Pierce, the mother of deceased patient Taylor Pierce, informing Edwards that Taylor Pierce was

---

[2]Additionally, agents arrested Edwards pursuant to an arrest warrant issued by a United States Magistrate Judge of the United States District Court for the Middle District of Alabama based on a criminal complaint. The complaint charged Edwards with unlawfully distributing controlled substance, in violation of 21 U.S.C. § 841.

On July 17, 2019, a grand jury of the United States District Court for the Middle District of Alabama returned a three-count indictment against Edwards. Each count charged Edwards with unlawfully distributing controlled substances.

24

overmedicating. Also in the letter, Dawn Pierce asked Edwards for help in getting Taylor Pierce into a drug rehabilitation program; and

    d.    In what appeared to be Edwards's desk, a copy of a letter from Blue Cross Blue Shield to Edwards informing Edwards that patient Amber Williams had overdosed on medications prescribed by Edwards.

### 2.    Opelika Vehicle Search

60.    During the search of the vehicle, the agents found and seized:

a.    A loaded Bersa .22 caliber handgun in the driver's side door pocket;

b.    A box of .22 caliber rounds in the driver's side door pocket;

c.    Two patient files in the trunk of the vehicle;

d.    Documents relating to Edwards's income tax returns; and

e.    Approximately $6,000 worth of rare silver coins.

61.    Additionally, the agents searched law enforcement databases for the tag number of the tag on the 2019 Porsche Panamera. The tag number was associated with a vehicle owned by Orr Motors, a car dealership located in Destin, Florida. Subsequent investigation revealed that the vehicle was a loaner given to Edwards by the dealership while his 2011 Porsche was being serviced.

### 3.    Gulf Shores Office Search

62.    During the search of the Gulf Shores office, agents found and seized:

a.    Numerous medical records;

b.    A prescription pad with Edwards's name at the top and Edwards's signature at the bottom with each prescription being otherwise blank.

## L.    July 19, 2019 Execution of Search Warrant of Edwards's Vehicle

25

63.     On July 19, 2019, DEA special agents and other law enforcement agents executed a warrant issued by a United States Magistrate Judge of the United States District Court for the Northern District of Florida to search a 2011 Porsche Panamera registered to Edwards. During the searches, the agents found, among other things, the following:

a.   Patient files;

b.   Non-controlled medication;

c.   a Steyer M9, .9 millimeter handgun, silencer, and live ammunition;

d.   a German Sports Guns 1911 handgun;

e.   Financial records related to Analytic Options;

f.   Records of over $30,000 in transactions with GovtMint.com for gold and silver coins;

g.   A letter from a patient on behalf of Edwards to a pharmacy that refused to fill her prescription written by Edwards;

h.   Keys, including ones likely to fit a safety deposit box.

**M.     Edwards Bankruptcy**

64.     Edwards filed a petition for Chapter 13 bankruptcy in December of 2016 in the Middle District of Alabama (Bankruptcy Petition #: 16-33547). In April of 2017, Edwards moved to convert his petition to a Chapter 11 bankruptcy. Bankruptcy Petition #: 16-33547, Doc. No. 29.

65.     In January of 2017, Edwards filed a summary of assets and liabilities with the bankruptcy court. Bankruptcy Petition #: 16-33547, Doc. No. 13. In that petition, Edwards stated that he had no firearms. *Id.* at page 4.

66.     In June of 2017, Edwards amended his summary of assets and liabilities and reported that he had 35 firearms totaling $4,500. Bankruptcy Petition #: 16-33547, Doc. No. 36.

In the most recently amended summary of assets and liabilities filed in January of 2018, Edwards maintained that he still had 35 firearms worth \$4,500. Bankruptcy Petition #: 16-33547, Doc. No. 114.

67.    Edwards's Chapter 11 Bankruptcy Plan was approved and the case was administratively closed in November of 2018.

68.    I have learned from Internal Revenue Service (IRS) agents that Edwards may be in default of his Chapter 11 Bankruptcy Plan because he has failed to timely make a payment of about \$27,000 to the IRS due on his 2018 income taxes. *See* Bankruptcy Petition #: 16-33547, Doc. No. 180, page 14.

## N.    Edwards's Firearms at Gulf States Distributors

69.    On July 24, 2019, an individual presented 67 firearms to Gulf States Distributors to sell. The individual stated that the 67 firearms belonged to Edwards and produced to Gulf States Distributors a consignment agreement signed by Edwards. The individual stated that the proceeds of the sale would be used to pay Edwards's legal fees. The individual further stated that Edwards had given him a total of approximately 100 firearms.

70.    Gulf States Distributors stated that a conservative estimate of the total value of the 67 firearms is \$24,300.

71.    Gulf States Distributors contacted local authorities who have secured the firearms.

72.    Because Edwards last reported to the bankruptcy court that he owned 35 firearms worth \$4,500, there is probable cause to believe that he made a false or fraudulent representation in relation to his Chapter 11 bankruptcy proceeding.

## CONCLUSION

27

73.     Based upon the foregoing and upon my training and experience, I submit that

there is probable cause to believe that the premises described as Gulf States Distributors, located

at 6000 E Shirley Lane, Montgomery, Alabama 36117, contains fruits, instrumentalities, and

evidence related to possible violations of Title 21, United States Code, Section 841(a)(1), to wit,

prescribing controlled substances outside the course of professional practice and without a

legitimate medical purpose; Title 18, United States Code, Section 1347, to wit, health care fraud;

Title 18, United States Code, Section 924(c), possessing a firearm in furtherance of a drug

trafficking crime; and Title 18, United States Code, Section 157, to wit, bankruptcy fraud.

Respectfully submitted,

Michael L. Rodgers
Task Force Officer
Drug Enforcement Administration

THE ABOVE AGENT HAS ATTESTED
TO THIS AFFIDAVIT PURSUANT TO
FED. R. CRIM. P. 4.1(b)(2)(B) THIS 24ᵗʰ
DAY OF JULY 2019

HON. SUSAN R. WALKER
UNITED STATES MAGISTRATE JUDGE

28

## **ATTACHMENT A**

## **Premises To Be Searched**

The premises to be searched is Gulf States Distributors, located at 6000 E Shirley Lane, Montgomery, Alabama 36117.

## **ATTACHMENT B**

**Particular Things to be Seized**

All records and other evidence relating to violations of Title 21, United States Code, Section 841(a)(1), Title 18, United States Code, Section 1347, Title 18, United States Code, Section 924(c), and Title 18, United States Code, Section 157, including:

1. Firearms consigned on behalf of James Henry Edwards;

2. Consignment agreement to sell firearms signed by James Henry Edwards.